Filed 1/23/14  In re Jonathan H. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JONATHAN H. et al., Persons Coming Under the Juvenile Court Law. | B244963 |
| | (Los Angeles County Super. Ct. No. CK91736) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LETICIA H.,<br><br>    Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debra L. Losnick, Juvenile Court Referee.  Affirmed.

Joseph D. Mackenzie, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

_____

Leticia H. (Mother) appeals from the juvenile court's jurisdiction and disposition orders declaring her three minor children dependents of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (b), removing them from Mother's custody, and placing them in the home of their adult half-sister subject to court supervision. Mother argues that the evidence was insufficient to support the jurisdictional findings as to all three children. She also asserts that the disposition order removing the two younger children, Mia and Miriam, from her custody was not supported by clear and convincing evidence that there was a substantial danger to the children if they were returned to Mother's care and there were no other reasonable means of protecting them from harm. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Initiation of the Current Dependency Proceedings

Mother and Juan H. (Father) have three children who are the subject of the current dependency petition: Jonathan (born July 1996), Mia (born February 1999), and Miriam (born April 2001).[2] Mother also has five adult children from a previous marriage. At the start of these dependency proceedings, Mother and Father had been separated for several years, Father was living in another state, and all three children were residing solely with Mother. The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in January 2012 based on a referral alleging that Mother's adult son, Paul D., was physically abusing Jonathan and that Mother was neglecting all three children.

As described in the DCFS's February 2012 detention report, Mother lived in a three-bedroom home with Paul, Jonathan, Mia, and Miriam. Paul and Jonathan shared

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Father is a non-offending parent and is not a party to this appeal.

2

one bedroom and Mia and Miriam shared another bedroom. Mother reported that she was disabled due to nerve damage in her legs and back. She had been prescribed a variety of pain medications to treat her condition. Mother did not work on a regular basis and received social security disability insurance. Paul, who was in his twenties, also did not work or attend school. According to Mother and the children, Paul was an alcoholic who would go out drinking at night and spend most of the day sleeping at home. When Paul returned home late at night from drinking, he often would wake up Jonathan with his loud and disruptive behavior. At times, Paul was physically aggressive with Jonathan, grabbing Jonathan and wrestling him to the ground.

Jonathan, who was then 15 years old, had been diagnosed with a heart condition called hypertrophic cardiomyopathy and had open heart surgery at age seven. In September 2011, following an episode of cardiac arrest, Jonathan had an implantable cardioverter defibrillator (ICD) surgically inserted to monitor and correct irregularities in his heart rhythm. At that time, Jonathan's cardiologist restricted him from engaging in any type of physical activity that would elevate his heart rate. One of the times that Paul grabbed and wrestled Jonathan to the ground occurred after the ICD surgery. Jonathan also was prescribed daily medication to treat his heart condition, but reported that he often forgot to take his required dosage and that Mother did not remind him. Jonathan's prescription was last filled in October 2011, but as of January 2012, the medication bottle was still almost full.

It was reported to the DCFS that, on December 26, 2011, Jonathan left Mother's home after a physical altercation with Paul. On that occasion, Mother was upset with Jonathan because his report card showed that he was failing most of his classes, but she did not address the issue directly with him. Instead, when Paul came home that night, he began screaming at Jonathan because of his failing grades. The following day, Paul took away Jonathan's cell phone, i-pod, and laptop, and when Jonathan tried to leave the home, Paul pushed and shoved him. Jonathan was able to get away and walked about a mile to the home of his adult half-sister, Jenny D., who allowed Jonathan to stay with her and her husband. After a few days, Jenny's husband called Mother to remind her that

3

Jonathan was staying at their home, and Mother said she was grateful that they were caring for him. However, several hours later, Mother and Paul showed up at Jenny's home accompanied by the police, and Mother accused Jenny of kidnapping Jonathan. The police told Jenny that they could tell that Mother and Paul were both intoxicated and that it was not safe for Jonathan to return to Mother's home. The police recommended that Jonathan stay with Jenny and that she report the matter to the DCFS. Jenny agreed, and shortly thereafter, contacted the agency.

Following Jenny's referral, the DCFS interviewed Mother and the children. In addition to describing Jonathan's heart condition, Mother reported that Mia had Graves' disease but was in remission, and Miriam had a learning disability and was benefitting from tutoring at school. Mother stated that all three children were up-to-date with their medical and dental appointments and denied that they were being neglected. Mother also denied that there was any physical abuse of Jonathan and indicated that, at most, Paul and Jonathan would playfully wrestle over her objection. Jonathan told the DCFS that he did not feel safe in Mother's home because of Paul who "could do anything at any time." According to Jonathan, Mother's behavior was also unpredictable with Mother showing affection toward him one minute and then yelling at him the next. Thirteen-year-old Mia stated that she "sometimes" felt safe in Mother's home, but she would get scared when Paul came home yelling and cursing because he was drunk. Mia also said that Mother often cried to her about the family's issues and Mia felt caught in the middle. Ten-year-old Miriam stated that she felt safe in the home because Mother was there to protect her. Neither Mia nor Miriam showed any signs of physical abuse, and both girls confirmed that no one in the home used corporal punishment to discipline them.

The DCFS also interviewed Jenny and her husband. As described by Jenny, Paul was an alcoholic and Mother was overmedicated, and both of them were unpredictable when they were not sober. When Jonathan was in the hospital for his ICD surgery, his doctor asked Jenny if Mother had narcolepsy because Mother had fallen asleep while he was talking to her about Jonathan. The doctor told Jenny that he was concerned about Mother making medical decisions for Jonathan and driving him home from the hospital.

4

Following the surgery, Jonathan stayed at Jenny's home for five days and Mother did not call him during that time. When Mother finally called, she was confused about when the surgery occurred. Jonathan's doctor also had recommended that he see a psychologist, but Mother had not made any arrangements to date. Jenny previously asked Mother if Jonathan could live with her and if she could become his legal guardian for medical and education related decisions, but Mother refused. Jenny's husband reported that Mother often left the children home alone. Jenny and her husband would take the children to their house and leave a message for Mother to call them once she was home, but they would not hear from her. Both Jenny and her husband explained that Mother and Paul had an unhealthy enabling relationship with Mother allowing Paul to stay in her home as long as he helped her take care of the children.

A public health nurse who examined Jonathan in early January 2012 noted that he appeared to be well-nourished and developing appropriately, but that he needed to take his prescribed medication on a daily basis and to use a home monitor device that would monitor his heart rhythm while he slept. Jonathan's cardiologist reported that the device had been ordered in connection with his ICD surgery, but had not been connected at home. The cardiologist's office also noted that Jonathan often missed or was late to his medical appointments, and that Mother failed to schedule a follow-up appointment at the last visit. The children's dentist reported that their last dental exams were in late 2009 and that no further exams had been scheduled. The nurse advised Mother that all three children needed to have regular physical and dental exams, and that Jonathan and Mia needed to follow up with their respective medical specialists.

At a team decision meeting held on January 9, 2012, Mother and Jenny agreed to the following action plan: (1) Jonathan would temporarily stay in Jenny's home; (2) Mother would ask Paul to leave her home that day and would secure the home to make sure that Paul could not break in; (3) Mother would enroll herself and the children in individual therapy by February 9, 2012; (3) Mother would make arrangements to allow Jenny to have direct contact with Jonathan's school; (4) Mother and Jenny would work together to arrange medical, dental, and mental health appointments for Jonathan and

Mother would ensure that all appointments were kept; and (5) Mother would participate in voluntary family maintenance services for six months. Later that day, the DCFS visited Mother's home and confirmed that Paul had moved out.

In late January 2012, the DCFS had follow-up visits with the family. Jonathan reported that he was doing well in Jenny's home. He visited Mother two times a week and was happy with the visits. He was able to concentrate in school and his teachers told Jenny that they saw a significant positive change in his behavior. Both Mia and Miriam expressed that their home environment was much calmer since Paul moved out. They indicated that they were happy in Mother's home and that she was meeting all of their basic needs. Mother was upset about the frequency and length of her visits with Jonathan and accused Jenny of not allowing her to have more contact with him. Mother also related that she had cancelled medical appointments for Jonathan and rescheduled them for different dates because Jenny had scheduled them without Mother's approval. Mother admitted that she had not initiated individual therapy for herself or the children, but stated that she believed it was the social worker's responsibility to do so. On multiple occasions, Jenny informed the DCFS that she was having difficulty communicating with Mother about Jonathan's care. After Jenny and Mother had a verbal altercation at Mother's home, Jenny told the case social worker that she wanted to continue caring for Jonathan, but she could no longer work with Mother.

In early February 2012, Jenny informed the DCFS that Paul had been staying with their paternal aunt, Kathleen D., since Mother asked him to move out. The aunt had told Jenny, however, Paul was visiting Mother's home three to four times per week, including staying overnight on two occasions. In an interview with the DCFS, the aunt confirmed that Paul had been visiting the home at Mother's request and helping her take care of Mia and Miriam. When the aunt told Paul that he was not allowed in Mother's home, Paul responded that he was not aware of any restrictions and that Mother had asked him to visit. The aunt stated that Mother's home was chaotic and Mother put a lot of pressure on Paul to help care for his younger siblings. The aunt also reported that she had spoken to Paul about seeking treatment for his alcoholism, but he said that he was not ready. Based

6

on its various interviews and Mother's non-compliance with the voluntary family maintenance plan, the DCFS decided to initiate dependency proceedings.

## II.     Section 300 Petition

On February 6, 2012, the DCFS filed a dependency petition on behalf of all three children under section 300, subdivisions (a), (b), and (j).  The petition alleged physical abuse of Jonathan by Paul, medical neglect of Jonathan by Mother, and general neglect of all three children by Mother based on her abuse of prescription medications and allowing Paul to reside in the home.  At the detention hearing, the juvenile court ordered that Jonathan be detained from Mother and placed in Jenny's home.  Mia and Miriam were not detained at that time.  The court set the matter for a pretrial resolution conference and ordered that the case not be discussed with any of the children.

On February 14, 2012, the DCFS filed an ex parte application pursuant to section 385 seeking an order detaining Mia and Miriam from Mother and placing the children with Jenny.  As set forth in the application, Jenny advised the DCFS on February 7, 2012 that Mia was very upset because Mother had been given a copy of the detention report, and after reading it, Mother screamed at Mia about the statements she had made to the case social worker.  Mia told Jenny that she thought her statements were confidential and that she did not want to speak to the DCFS any further.  The following day, Mia told the case social worker that she had asked her appointed attorney if she could be placed in Jenny's home.  Mia stated that she felt safe in Mother's home, but she wanted Mother "to be able to take care of her stuff."  She also said that Mother believed everyone was against her and that "if we're not there, she won't have us there to cry to and she will have to think on her own about how to make things better."

On February 14, 2012, the juvenile court ordered that Mia and Miriam be detained from Mother and placed in Jenny's home.  Mother was granted family reunification services for all three children, including monitored visitation.  Because of the conflict between Mother and Jenny, the DCFS was ordered to assist in arranging a visitation and telephone contact schedule for Mother and the children.  At the March 16, 2012 pretrial

resolution conference, the juvenile court set the matter for a contested jurisdiction and disposition hearing.

### III.   Jurisdiction/Disposition Report

For its March 16, 2012 Jurisdiction/Disposition Report, the DCFS conducted individual interviews with the family about the allegations in the section 300 petition. As to the allegation that Mother was neglecting Jonathan by failing to meet his medical needs, Jonathan reported that he had been prescribed medication to take twice a day for his heart condition and that Mother did not remember to give him the medication a lot of times. Jenny expressed concern that Jonathan's medication bottle was almost completely full when he came to stay with her, and that Mother could not handle Jonathan's medical needs because Mother was taking too much medication herself. Mother explained that the cardiologist had decided to decrease Jonathan's dosage to once a day due to the side effects and that Jenny incorrectly had assumed Mother was failing to give Jonathan his medication. Mother stated that she always took Jonathan to his medical appointments and that she only forgot to give Jonathan his medication on one or two occasions.

As to the allegation that Mother was neglecting all three children by allowing Paul to stay in her home while he was under the influence of alcohol, both Mother and the children reported that Paul had a pattern of drinking alcohol outside the home and then returning to the home late at night drunk. Jenny recounted that Paul had been drinking alcohol since he was a teenager and had been hospitalized in the past due to alcohol related seizures. Paul had his license suspended in August 2011, but continued to drive Mother to her medical appointments. Jenny stated that Mother often left the children alone or with Paul. The children also confirmed that Mother would leave them in Paul's care at times, but never when Paul was drunk. Mother maintained that she was always home and able to protect the children. She also related that she recently had obtained a temporary restraining order against Paul because she did not want him in her home.

As to the allegation that Mother's abuse of prescription medications rendered her incapable of providing regular care to the children, all three children reported that Mother

took a lot of pain medication. Jonathan believed that Mother had a problem with her pain medication because of the amount she took. Jonathan related that Mother would stay in her room a lot and watch television for a long time, and that he would take care of Mia and Miriam because Mother could not do so. Mia similarly expressed that she thought Mother took too much medication. She confirmed that Mother would spend a lot of time lying in bed and Paul would take care of them when Mother was in bed. Miriam stated that Mother would take medication in the morning and at night and would stay in her room for a long time. Jenny told the DCFS that Mother had a history of prescription medication abuse. Jenny also said that Mother would stay in bed a lot because she was overmedicated and that Paul would be left to care for the children.

Mother admitted that she had been taking prescription pain medication for the past 10 years, but denied she was abusing any medication. Mother had been diagnosed with a degenerative disc disease and had undergone three prior surgeries on her back. Mother reported that she had permanent nerve damage in her back and legs and took medication for pain but only as prescribed. During an interview with the case social worker, Mother brought all of her prescribed medications which included Alprazolam (two milligrams once a day), Cymbalta (60 milligrams three times a day), Oxycodone (one tablet three times a day), Morphine (one tablet three times a day), Diazepam (one tablet at bedtime), Clonazepam (one tablet twice a day), and Ketolomepazole (one tablet twice a day). Mother also provided contact information for the orthopedist who had prescribed her pain medications, but the DCFS had been unable to reach him.

The DCFS reported that the children had been attending monitored visits with Mother and they were always happy to see her. Mother was appropriate during the visits and interacted well with the children. The children also appeared to be well-adjusted in Jenny's home and had not exhibited any mental or emotional problems since their detention. Jonathan told the DCFS that he thought it was better for him and his siblings to live with Jenny. Mia stated that she wanted to stay with Jenny until Mother was better, and Miriam expressed that she wanted to return to Mother's home eventually. The DCFS recommended that all three children be declared dependents of the juvenile court and

9

remain placed in Jenny's home under the agency's supervision. The DCFS requested that Mother be granted family reunification services, including individual counseling, parenting education, on-demand drug testing, and a medical evaluation of her prescription medication regimen. It also recommended that all three children attend individual counseling, and when appropriate, conjoint counseling with Mother.

In a May 10, 2012 supplemental report, the DCFS did not make any changes in its recommendations concerning placement and visitation. In a follow-up interview with the DCFS, Jonathan reported that he wanted to remain in Jenny's home and for Jenny to become his legal guardian. Both Mia and Miriam expressed that they eventually would like to go back to Mother's home. All three children indicated that their visits with Mother were going well. The report noted that Mother had agreed to submit to an on-demand drug test in April 2012 and had tested positive for Morphine.

The report included a March 9, 2012 letter from Mother's orthopedist who stated that Mother had been under his care for chronic pain management since 2003. As set forth in the letter, Mother suffered from chronic cervical and lumbar disc disease with nerve damage in the upper and lower extremities, and had chronic pain due to three failed lumbar surgeries. The orthopedist reported that Mother was "adherent to the program" and "followed all medical recommendations," and that there were "no signs of abuse of medications." He also noted that Mother's current medications were "of great importance for her in the management of her chronic pain," and that without these medications, "her condition will continue to deteriorate and she will not be able to care for herself independently." In addition, the orthopedist stated that Mother's medications had "not caused any disturbance in her mental capability," and that Mother was "able to care for herself and her children" under her current medical regimen.

## IV.    Jurisdiction Hearing

At the May 10, 2012 jurisdiction hearing, the section 300 petition was amended.[3] Mother executed a waiver of rights and entered a plea of no contest to the amended petition.  The juvenile court found that Mother knowingly, intelligently, and voluntarily had waived her rights with an understanding of the nature and consequences of her waiver and plea.  All counsel joined in the waiver and plea and stipulated to the court's finding that there was a factual basis for the plea.  The court sustained the petition as amended and found that each of the children was a person described by section 300, subdivision (b).  The court then continued the matter for the disposition hearing and ordered the DCFS to submit a supplemental report on Mother's pain management regimen that specifically addressed all of the medications she currently was taking.

---

[3]    The amended petition alleged three counts under section 300, subdivision (b):

Count b-2.  "The child Jonathan [H.] was diagnosed with Hypertrophic Cardiomyopathy and Implanted Cardioverter Defibrillator.  The child's mother, Leticia [H.], on occasion failed to regularly provide the child with the child's prescribed medication.  Such medical neglect on the part of the child's mother endangers the child's physical health and safety and places the child and the child's sibling[s] Mia [H.] and Miriam [H.] at risk of physical harm, damage and medial neglect."

Count b-3.  "The children, Jonathan [H.], Mia [H.] and Miriam [H.'s] mother, Leticia [H.] created a detrimental and endangering home environment for the children in that the mother allowed the children's adult sibling, Paul [D.], who is frequently under the influence of alcohol in the children's home in the children's presence[,] to reside in the children's home and have unlimited access to the children.  Such a detrimental and endangering home environment established for the children by the mother endangers the children's physical health and safety and places the children at risk of physical harm and damage."

Count b-4.  "Mother's use of prescription medication in combination with morphine renders the mother periodically incapable of providing care of the children which endangers the children's physical health and safety and creates a detrimental home, placing the children at risk of physical harm, damage, and danger."

11

## V.     Supplemental Reports

In a May 30, 2012 supplemental report, the DCFS indicated that it had obtained additional information from Mother about her medical treatment. Mother reported that she remained under the care of her orthopedist for chronic pain. She also was being treated by a psychiatrist and had begun individual counseling with a psychologist. In a May 2012 meeting with the DCFS, Mother brought all of her current prescribed medications, which consisted of Cymbalta (60 milligrams twice a day), Morphine (one tablet three times a day as needed), Alprazolam (two milligrams twice a day as needed), Oxycodone (15 milligrams every 8 hours as needed), Soma (350 milligrams at night), and Abilify (five milligrams once a day). Mother's psychiatrist had prescribed Cymbalta and Abilify for depression and her orthopedist had prescribed the other medications for her chronic cervical and lumbar disc pain. Mother stated that she only took the medications as prescribed and was not taking any others at that time. Mother's psychiatrist advised the DCFS that the medications he had prescribed for Mother would not interfere with her ability to care for her children if taken as directed. The DCFS had attempted to contact Mother's orthopedist, but had not heard back from him. Mother submitted to another on-demand drug test in May 2012 and tested positive for Morphine at that time. The DCFS reported that the children continued to do well in their placement with Jenny and in their monitored visits with Mother.

On May 30, 2012, the juvenile court set the matter for a contested disposition hearing. At the DCFS's request, the court also ordered Mother to submit to a medical evaluation of her pain management regimen pursuant to Evidence Code section 730. However, the DCFS later reported that the evaluation could not be completed because the parties had been unable to find an expert on pain management who would perform the evaluation.

In two August 2012 supplemental reports, the DCFS stated that Mother remained under the care of her orthopedist, psychiatrist, and psychologist. Mother had advised the DCFS in July 2012 that she currently was taking the following prescribed medications: Cymbalta (two 60 milligram tablets once a day), Morphine (one tablet once a day as

12

needed), Alprazolam (two milligrams twice a day as needed), Oxycodone (15 milligrams once a day as needed), Abilify (five milligrams once a day), and Strattera (one tablet once a day). She denied taking any other medications at that time. Although she previously had agreed to submit to on-demand drug testing, Mother had not complied with the DCFS's requests for testing in June, July, and August 2012. The DCFS had left multiple telephone messages for Mother's orthopedist to discuss her pain medication regimen, but he still had not returned any of the agency's calls.

The DCFS had received a July 20, 2012 letter from Mother's psychologist who reported that Mother was attending weekly individual therapy and was very involved and motivated in her treatment. The psychologist was aware that Mother was taking psychotropic and pain medications, and stated that she had shown "no signs of overuse of such medications." He noted in the letter that Mother's speech was coherent, her orientation was "intact in all spheres," and her stream of thought was "linear" and "goal oriented." He also observed that Mother had good eye contact and concentration, and he described her insight and judgment as fair to good. The psychologist opined that it was in the children's best interest to be reunited with Mother as she continued to receive her full regimen of treatment.

The DCFS reported that the children continued to attend monitored visits with Mother twice a week and had daily telephone contact with her. Both Mother and the children were affectionate during the visits and the children confirmed that the visits were going well. All three children were also attending individual counseling. Mia's therapist reported that the child had symptoms of depression and anxiety, but had shown "an improvement in her ability to express her feelings appropriately which [had] decreased the intensity and frequency of Mia's conflict with her caregiver." On August 2, 2012, the DCFS met with the children about their current placement. Jonathan indicated that he would like to have overnight and weekend visits with Mother, but he wanted to continue living with Jenny. Mia reported that she thought Mother was doing much better and she wanted to return to Mother's home by the next hearing. Miriam stated that she enjoyed her visits with Mother and she would like to go back to Mother's home by the next year.

The DCFS recommended that the children remain placed with Jenny under the agency's supervision and that Mother begin unmonitored visitation with the children. Due to concerns that Mother's prescribed medications caused drowsiness and fatigue, the DCFS also recommended that Mother be restricted from driving with the children during the unmonitored visits.

## VI.    Disposition Hearing

The contested disposition hearing was held over a two-day period on August 16 and 23, 2012. Without objection, the juvenile court admitted into evidence the various reports and attachments submitted by the DCFS. Mia and Miriam each testified in chambers. Mia stated that her visits with Mother were going well and that she was comfortable starting unmonitored visits. She also said that she wanted to return to Mother's home, but was not ready to do so that day. Mia could not articulate why she was not ready to go home nor could she identify anything that could be done to make her feel more comfortable about returning to Mother's care. Miriam similarly testified that she did not want to return to Mother's home that day. Miriam stated that it had not been "enough time" and that it was "too . . . early" for her to go back to Mother. Miriam felt that both she and Mother needed more time, but could not identify anything in particular that she wanted to see happen before she went home. Miriam indicated that she enjoyed visiting with Mother and was willing to try unmonitored visits.

The dependency investigator assigned to the case was also called to testify. She testified that she believed the children would be at substantial risk of harm if they were returned to Mother's home because Mother was taking medications that caused drowsiness and other related symptoms. The investigator acknowledged that she had spoken with Mother's psychiatrist and psychologist, both of whom were aware of Mother's prescribed medications and did not have any concerns about her medication usage. The investigator also stated that she had attempted to speak with Mother's orthopedist many times, but he never responded to any of her calls. As described by the investigator, the DCFS had consulted with the public health nurse about Mother's

medications and the nurse had indicated that the medications caused fatigue, sleepiness, tiredness, and drowsiness. Based on that information, the DCFS was concerned that Mother would not be able to provide the children with proper care. Although the investigator had received letters from Mother's medical providers about her current treatment, she indicated that the DCFS wanted more specific information about Mother's pain medication regimen.

Mother testified that she had been taking pain medication for the past 10 years. She had three failed lumbar surgeries and could not have any further surgeries due to degenerative disc disease. Mother did not take any of her prescribed pain medications on a daily basis and there were days when she did not need any pain medication. Prior to taking medication on any given day, Mother would take a hot shower. If the pain was not alleviated, Mother would take her lowest strength medication, which was Morphine, and lie down with a heating pad. If the pain persisted, Mother would take her stronger medications. Mother's orthopedist never told her that she was overusing her medications or that she could not take multiple pain medications on the same day. Mother's orthopedist had prescribed Morphine, Oxycodone, Xanax and Soma, and her psychiatrist had prescribed Cymbalta and Abilify. Mother also been prescribed Percocet for pain following a recent knee surgery and Strattera for problems with concentration. Mother's doctors did not advise her that any of her medications could cause drowsiness or difficulty concentrating. Mother had been under the care of her psychiatrist since March 2012 and was attending weekly individual counseling with her psychologist. She also was enrolled in a parenting education course and had attended six classes.

At the close of the evidence, counsel for the DCFS and counsel for the children joined in requesting that all three children be removed from Mother's custody and placed in Jenny's home under continued court supervision. Mother's counsel argued that the children should be returned to Mother's home because each of her doctors had stated that Mother was not abusing her prescribed medications and the DCFS had not presented clear and convincing evidence that Mother's use of medications posed a substantial danger to the children.

15

The juvenile court declared all three children dependents of the court pursuant to section 300, subdivision (b), and ordered that each of the children be removed from Mother's care and custody and suitably placed by the DCFS. The court ordered family reunification services for Mother, including individual counseling to address coping skills and other case issues, random on-demand drug testing, and completion of a drug abuse program if Mother tested positive for any non-prescription medications. The court also granted Mother unmonitored visitation with the children in a neutral setting provided that Mother not drive with the children in her vehicle. Following the disposition hearing, Mother filed a notice of appeal from the juvenile court's jurisdiction and disposition orders.

## DISCUSSION

### I.     Jurisdiction Order

On appeal, Mother first contends that the evidence was insufficient to support the juvenile court's jurisdictional findings as to all three children. However, as discussed above, Mother executed a waiver of rights form in which she pleaded no contest to each of the amended allegations in the section 300 petition. At the jurisdiction hearing, the juvenile court found that Mother's waiver was knowingly, intelligently, and voluntarily made, that Mother understood the nature and consequences of her waiver and plea, and that there was a factual basis for the plea in the DCFS's submitted reports. As reflected in the juvenile court's minute order, all counsel joined in the waiver and plea and also stipulated to the court's finding that there was a factual basis supporting the plea.

As the California Supreme Court has explained, "[a] plea of 'no contest' . . . is the juvenile court equivalent of a plea of 'nolo contendere' . . . in criminal courts. A plea of 'no contest' to allegations under section 300 at a jurisdiction hearing admits all matters essential to the court's jurisdiction over the minor." (*In re Troy Z.* (1992) 3 Cal.4th 1170, 1181.) Accordingly, "[i]t is well settled that a party who enters a no contest plea to a section 300 petition is barred from bringing an appeal to challenge the sufficiency of the evidence supporting the jurisdictional allegations, as the party has already admitted all

16

matters essential to the court's jurisdiction." (*In re Andrew A.* (2010) 183 Cal.App.4th 1518, 1526, citing *In re Troy Z.*, *supra*, 3 Cal.4th at p. 1181; see also *In re N.M.* (2011) 197 Cal.App.4th 159, 167 ["plea of no contest to a section 300 petition . . . bars the parent from bringing an appeal to challenge the sufficiency of the evidence supporting the jurisdictional allegations"].) Given her no contest plea to the amended petition, Mother waived her right to challenge the sufficiency of the evidence supporting the juvenile court's jurisdictional findings on appeal.

## II. Disposition Order

Mother also challenges the portion of the juvenile court's disposition order removing the two younger children, Mia and Miriam, from Mother's care and custody and placing the children in Jenny's home subject to the court's supervision.[4] Mother claims that the evidence was insufficient to support a finding that the children would be in substantial danger if they were returned to her care, and that there were no reasonable means of protecting the children other than removal from her custody.

Section 361, subdivision (c) permits the removal of a child from the custody of his or her parent if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if he or she were returned home, and "there are no reasonable means by which the [child]'s physical health can be protected without removing" the child from the parent's custody. (§ 361, subd. (c)(1).) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The [juvenile] court may consider a parent's past conduct as well as present

---

**4** Mother does not challenge the portion of the disposition order concerning Jonathan.

17

circumstances. [Citation.]" (*In re N.M.*, *supra*, 197 Cal.App.4th at pp. 169-170.) An appellate court reviews a disposition order removing a child from parental custody for substantial evidence. (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

Mother argues that her use of prescription medications did not support a finding that Mia and Miriam would be in substantial danger if they were returned to her home. Mother reasons that her prescribing doctors had advised the DCFS that her medications were a necessary component of her treatment regimen and that Mother had not shown any signs that she was abusing her medications. However, the relevant issue at the disposition hearing was not whether Mother's prescribed medications were medically necessary; her treating doctors clearly indicated that they were. Instead, the relevant issue was whether Mother's use of the medications as prescribed rendered her incapable of providing regular care to the children, and thus, posed a substantial danger to the children's health and well-being if they were returned to her home. Although Mother's doctors reported that the medications they had prescribed would not interfere with Mother's ability to care for the children if taken as directed, there was ample evidence before the juvenile court to support a finding that Mother was unable to provide her children with proper care and supervision and that removal from her custody was the only reasonable means of protecting the children from harm.[5]

Specifically, there was evidence that Mother had a history of failing to take Jonathan to his scheduled medical appointments and failing to make sure that the child consistently took the medication that was necessary to treat his serious heart condition. On one occasion while Jonathan was in the hospital for the ICD surgery, Mother fell

---

[5] Mother notes that the juvenile court did not expressly state on the record that it had found that there were no reasonable means of protecting the children other than removal from her custody. However, the juvenile court's minute order from the disposition hearing included the requisite findings to support its removal order, and the totality of the evidence presented at the hearing was sufficient to support those findings.

asleep during a face-to-face meeting with his cardiologist, who expressed concern that Mother should not be driving the child home from the hospital or making decisions regarding his medical care. Additionally, all three children indicated in their statements to the DCFS that Mother's medication usage was interfering with her ability to adequately care for them. The children similarly related that Mother would spend a lot of time in her room lying in bed and that she relied on Paul to take care of them when she could not leave her room. Jenny likewise reported that Mother stayed in bed a lot because she was heavily medicated and that Mother often delegated her parenting responsibilities to Paul.

Furthermore, Mother, Jenny, and the children each confirmed that Paul frequently was under the influence of alcohol while in Mother's home. Even after Mother agreed to exclude Paul from her home as part of the voluntary family maintenance plan, she continued to allow Paul back into her home and asked for his assistance in picking up Mia and Miriam. Multiple family members told DCFS that Mother and Paul had an unhealthy enabling relationship with Mother permitting Paul to reside in her home despite his serious alcohol abuse as long as he helped her take care of the children. Although Mother obtained a restraining order against Paul shortly after Mia and Miriam were detained, the juvenile court reasonably could have found that there was a substantial risk that Mother would allow Paul back into her home if the children were released to her because she needed Paul to act as their caretaker when she was incapable of doing so.

Finally, both 13-year-old Mia and 11-year-old Miriam testified at the disposition hearing that they were not ready to return to Mother's home. Both girls stated that they loved Mother, that they knew she loved them, and that they wanted to go back to Mother's home at some point in the future. They also expressed that they were enjoying their monitored visits with Mother and were willing to try unmonitored visits. However, both girls were clear in their testimony that they did not want to return to Mother's care at that time and that they needed additional time before they were ready to go home. Based on the totality of the record, the juvenile court's disposition order as to Mia and Miriam was supported by substantial evidence.

**DISPOSITION**

The juvenile court's jurisdiction and disposition orders are affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.